# UNITED STATES DISTRICT COURT

for the
Eastern District of Wisconsin

In the Matter of the Search of:

INFORMATION ASSOCIATED WITH
FACEBOOK USER ID 1170944091 THAT IS
STORED AT PREMISES CONTROLLED BY
FACEBOOK, INC.

Case No. 19 - M - 181

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

located in the Eastern District of Wisconsin, there is now concealed:

The basis for the search under Fed. R. Crim P. 41(c) is:

☒ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

_____Park Jones, IRS Special Agent_____
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: July 23, 2019

_____
*Judge's signature*

Case 2:19-mj-00181-DEJ   Filed 08/28/19   Page 1 of 21   Document 1

City and State: Milwaukee, Wisconsin

_____David E. Jones, U.S. Magistrate Judge_____
*Printed Name and Title*

I, Park Jones, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2.      I am employed as a Special Agent with the Internal Revenue Service, Criminal Investigation (IRS-CI) and have been so employed since September 2005.  My responsibilities as a Special Agent include the investigation of potential criminal violations of the Internal Revenue Code under Title 26 of the United States Code as well as related Title 18 and Title 31 offenses.  The facts set forth in this affidavit are based on my personal knowledge, documents and records I have reviewed in the course of this investigation, information I have gained through my law enforcement training and experience, and information I have obtained from others, all of whom I believe to be truthful and reliable.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of filing a false claim, mail and wire fraud, and engaging in unlawful monetary transactions, in violation of Title 18 United States Code Sections 287, 1341,1343, and 1957, have been committed by Francis Burns. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## PROBABLE CAUSE

### Background on Estate Tax Returns

5.     An estate is the sum of an individual's assets, rights, entitlements and interests to property of any kind. When an individual deceases, their assets become property of their estate. The United States levies federal taxes on estates. There are two kinds of taxes owed by an estate: one on the transfer of assets from the decedent to their beneficiaries and heirs (the estate tax), and another on income generated by assets of the decedent's estate (the income tax).

6.     An income tax is levied when a decedent's estate income (examples include: interest earned on bank accounts, CDs, stocks, bonds, mutual funds and rental property) generates more than $600 in annual gross income. The income and tax is reported on an IRS Form 1041, U.S. Income Tax Return for Estates and Trusts.    The executor or personal representative of the estate must file the Form 1041. The Form 1041 can be filed electronically or by paper with the IRS.

7.     The decedent and their estate are separate taxable entities.  Therefore, the estate needs to obtain a tax identification number before filing a Form 1041.

2

8.     A decedent's estate computes its gross income in the same manner as an individual. Most deductions and credits allowed to individuals are also allowed to estates and trusts.

9.     Typically, the filing requirement for Form 1041 starts on the day of the estate owner's death and ends on Dec. 31 of the same year. The executor, however, can file an election to choose a fiscal year, which means the tax year ends on the last day of the month before the one year anniversary of death. The executor then has up to 12 months to file the income tax return.

10.    Federal taxes are paid as the income is received rather than paying all the tax at the end of the year. This is referred to as the pay-as-you-go tax. The IRS has two methods for paying-as-you-go:

- Withholding – the tax is withheld from the income earned by an entity. This method is typically used by an employer to withhold income tax from an employee's pay. In addition, tax may be withheld from certain other income, such as pensions, bonuses, commissions, and gambling winnings. The amount of tax withheld is remitted to the IRS in the entity's name and taxpayer identification number.

- Estimated tax – this is a method used to pay tax on income that is not subject to federal withholding tax. This is used on income such as dividends, interest, capital gains, rents, and royalties.

11.    The IRS has an electronic system ("e-file") for taxpayers to submit tax returns and other supporting documents to the IRS through an internet or direct connection. This is known as online filing. The preparation of an online return can be initiated from any personal computer with an internet connection. A taxpayer filing online must submit their return to the IRS via an authorized IRS e-file provider such as Intuit, Tax Act, H&R Block Online. The provider will act

3

as a transmitter and send the formatted electronic tax return information directly to the IRS. The provider captures the Internet Protocol (IP) information such as the address, date, time and time zone of the origination of a tax return filed online by a taxpayer. This information is transmitted with the taxpayer's electronic return to the IRS.

## Summary of Investigation

12.     A tax refund fraud scheme involves one or more individuals who prepare and/or file false income tax returns on their own behalf using false income, deductions or tax withholding amounts to generate fraudulent claims for refund. A Form 1041 can be used fraudulently similar to a Form 1040. In each return, a taxpayer can manipulate the numbers on the Form using fraudulent income or tax withholding numbers to generate a fraudulent refund.

13.     On or about September 29, 2016, the IRS electronically received a 2015 Form 1041 in the estate name of Francis Burns ("Burns"). The address on the return was 3421 West Vliet Street Ste [Suite] 80734, Milwaukee, Wisconsin 53208.     According to United States Postal Service online records, the address of 3421 West Vliet Street, Milwaukee, Wisconsin is a retail location of a United States Post Office. Your affiant obtained the Post Office Box Application for PO Box 80734 in Milwaukee, Wisconsin. The owner of the PO Box listed on the application is World Burns Inc. c/o Francis Burns. Burns used his Wisconsin driver's license as an identification document to open the mailbox.

14.     The Form 1041 has several sections at the beginning of the return that assist the IRS in determining the type of return being filed i.e. a trust or estate tax return. In section A, the "Decedent's Estate" box was checked indicating the tax return being filed was for an estate. In addition, in sections D & F respectively, the Date entity created listed a date of October 19, 1985

4

and the "initial return" box checked. These items indicate that an estate was created on October 19, 1985 and the initial estate tax return is being filed for 2015.

15.    The return reported no income or deductions.

16.    In the tax and payments section, the return had reported $132,814 on line 24e – Federal income tax withheld. On the same line, there is a question asking "If any is from Form 1099, check [a box]." The box is checked indicating that all or a portion of the federal tax withheld would be substantiated by a corresponding Form 1099 filed by the withholder. The IRS has no record of any tax withholdings for the Francis Burns estate.

17.    Based on the large amount of unsubstantiated federal tax withholdings reported on the return, a refund of $132,814.00 was issued on November 8, 2016 to the Francis Burns Estate.

18.    The refund check was deposited through an automated teller machine into a Wells Fargo Bank account, the last four numbers of which are 1880on November 17, 2016. The account was titled Burns Francis TTE Under DEC of TR 04/24/2016 TR. The signor on the account was Francis Burns.

19.    On or about December 1 and December 8, 2016, Burns conducted two overseas wire transfers of $10,000 and $55,580 respectively to a bank account in Italy. The beneficiary of the transfers was an individual named M.B. residing in Treviso, Italy. M.B and Francis Burns had filed a married filing joint tax return in 2009.

20.    On February 3, 2017, the IRS electronically received a 2016 Form 1041 in the estate name of Francis Burns. The address on the return was 3421 West Vliet Street Ste [Suite] 80734, Milwaukee, Wisconsin 53208. The return was filed electronically online through TaxAct, Inc. TaxAct is an electronic transmitter based out of Cedar Rapids, Iowa. According to

5

records obtained from TaxAct, Inc., the contact information on the 2016 Form 1041 was Francis Burns using a residential address of 3421 West Vliet Street, Milwaukee, Wisconsin and an email address of FRANCESCOBURNS@GMAIL.COM. Your affiant obtained the subscriber records from Google for the email address FRANCESCOBURNS@GMAIL.COM. The subscriber name is Francesco Burns with a phone number of 414-XXX-5336. This is the same number Burns has used to contact SA Jones during the investigation.

21.     The online tax return originated from IP address ending in xx.xxx.xxx.238. An online geolocation search for IP address x.238 revealed the IP address originated in Pistoia, Italy.

22.     Your affiant has obtained the travel records for Francis Burns from United Airlines. On December 28 and 29, 2016, Burns traveled from Chicago O'Hare International Airport to Frankfurt, Germany. Burns then took a connecting flight from Frankfurt, Germany to Venice, Italy. Burns then returned from Venice, Italy to Chicago, Illinois on February 27, 2017. Therefore, Burns was in Italy during the filing of the 2016 Form 1041.

23.     The return reported total income of $1,135,356. The income reported was $961,860 of interest income and $173,496 of other income. The income typically would be substantiated by a corresponding Form(s) 1099 filed by the interest and income payers. The IRS has no record of any income reported for the Francis Burns estate. In the tax and payments section, the return had reported $4,023,936 on line 24e – Federal income tax withheld. On the same line, there is a question asking "If any is from Form 1099, check [a box]." The box is checked indicating that all or a portion of the federal tax withheld would be substantiated by a corresponding Form 1099 filed by the withholder. The IRS has no record of any withholdings for the Francis Burns estate.

6

24. Based on the large amount of unsubstantiated federal tax withholdings reported on the return, a refund of $3,539,726.00 was issued on March 7, 2017 to the Francis Burns Estate.

25. On or about March 22, 2017, bank account x5849 was opened at Associated Bank. The signors on the account were listed as Burns Francis as Trustee and Francis Burns. It is unknown why Burns is listed a signor as Burns Francis rather than Francis Burns. On the signature card, Burns listed his employer as World Burns, Inc.

26. On or about March 22, 2017, Burns deposited the 2016 tax refund check of $3,539,726 into bank account x5849 at Associated Bank titled Francis Burns As Trustee – Francis Burns Trust UTA 4/24/16.

27. On or about March 8, 2018, your affiant had a phone conversation with Francis Burns. Burns told your affiant that he would be filing corrected estate tax returns.

28. On or about March 26, 2018, the IRS received a 2015 Form 1041 in the estate name of Francis Burns. The address on the return was 3421 West Vliet Street Ste [Suite] 80734, Milwaukee, Wisconsin 53208.

29. The return reported total income of $133,694 which was mostly interest income. The IRS has no record of any income reported for the Francis Burns estate. In the tax and payments section, the return had reported $1,254,047 on line 24e – Federal income tax withheld. On the same line, there is a question asking "If any is from Form 1099, check [a box]." The box is checked indicating that all or a portion of the federal tax withheld would be substantiated by a corresponding Form 1099 filed by the withholder. The IRS has no record of any withholdings for the Francis Burns estate

7

30.     The return contained a document titled "Affidavit of Notice to Rescind Tax Filings For Year(s) 2015. The document listed an Executor Office for Francis Burns at Nation Tuscany, Via Valdibrana No.275, Pistoia, Italy.

31.     On or about April 2018 the IRS received a 2017 Form 1041 in the estate name of Francis Burns. The address on the return was 3421 West Vliet Street Ste [Suite] 80734, Milwaukee, Wisconsin 53208. In the tax and payments section, the return had reported $71,637,37 on line 24e – Federal income tax withheld. The IRS has no record of any withholdings for the Francis Burns estate. The IRS sent Burns a refund check for $70,673,971 on March 5, 2019 and Burns attempted to deposit the check into an Ally Bank account in Pennsylvania. Ally Bank contacted the IRS when Burns attempted to deposit the check, and the IRS informed Ally Bank they should not accept the deposit, as it was sent to Burns based on a fraudulent tax return.

32.     On or about May 26, 2017, a signature bearing Francis Burns signed an American Land Title Association Settlement statement to purchase property at 4512 South Drexel Boulevard, Chicago, Illinois. The buyer listed on the settlement statement was World Burns, Inc.     The settlement shows the final sales price of the property was $750,000.00 and after adjustments/other charges $757,725.00 was paid by World Burns, Inc.

33.     On or about May 26, 2017, a wire transfer of $757,725 from Associated Bank x5849 to Attorneys Title Guaranty Fund was completed to purchase the defendant property. As mentioned above, account x5849 was opened approximately 2 months prior to the purchase of the defendant property. The account was funded by only two deposits from the date of the account opening until the purchase of the defendant property. The first deposit was the tax refund check of $3,539,726 from the fraudulent filing of the 2016 Form 1041 which occurred on

8

March 22, 2017.  The second deposit was for $15,657.71 which occurred on March 24, 2017.  These funds were derived from an account closing at another financial institution.  Therefore, the funding of account x5849 was 99.6% of proceeds from electronic filing of the 2016 Form 1041 tax return by Burns.

34.    On or about June 5, 2017, a Special Warranty Deed for the defendant property was filed with the Cook County Illinois Recorder of Deeds Office.  The deed transferred ownership of the defendant property to World Burns, Inc.

35.    On or about September 12, 2017, Burns instructed Associated Bank personnel to send $75,000 a via wire transfer to a business in Las Vegas from whom Burns purchased a Mercedes S550 Limousine.

## Burns's Facebook Account

36.    IRS personnel have viewed the Francis Burns's publicly available Facebook profile form an IRS owned computer.  The username of the profile is Francesco Burns and the profile is found at https://www.facebook.com/francesco.burns. **The user ID for the profile is 1170944091**.  The profile picture is a picture of Francis Burns.  In the profile there are pictures posted and available for any member of the public to view of Burns and other people in a Mercedes S550 Limousine.  Pictures are posted of the limousine with Burns in the car as recently as December 16, 2018.  These pictures are still posted on Burns's profile as of July 22, 2019.

37.    In addition, on May 6, 2019, a post is made referencing a link to a YouTube video titled "Changing Legal Status."  A portion of the video has a section called "I.R.S. is a private trust domiciled in Puerto Rico."  The narrator of the video states "the IRS is a private collection branch for the Federal Reserve...  The IRS does not collect money for the government.  They

9

[IRS] are a private trust domiciled in Puerto Rico." The narrator further adds in this section states "So, you want to pay your taxes. It's your choice."

38.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

39.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

40.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

41.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook

10

users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

42.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

43.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

44.     Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post

11

comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

45. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

46. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

47. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

48. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

49. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

50. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a

12

Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

51. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

52. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

53. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence

13

is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geolocation into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

54. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

14

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

55. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

56. Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

57. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

15

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook user ID 1170944091 that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

## Particular Things to be Seized

## I. Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)    All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)    All activity logs for the account and all other documents showing the user's posts and other Facebook activities **September 29, 2016 through May 6, 2019**;

(c)    All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them **September 29, 2016 through May 6, 2019**, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)    All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification

numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e) All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f) All other records and contents of communications and messages made or received by the user, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g) All "check ins" and other location information;

(h) All IP logs, including but not limited to all records of the IP addresses that logged into the account;

(i) All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j) All information about the Facebook pages that the account is or was a "fan" of;

(k) All past and presfent lists of friends created by the account;

(l) All records of Facebook searches performed by the account **September 29, 2016 through May 6 2019;**

(m) All information about the user's access and use of Facebook Marketplace;

(n) The types of service utilized by the user;

2

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within 30 days of service of this warrant.

3

**II. Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. Sections 287, 1341, 1343, and 1957 involving Francis Burns since September 29, 2016, including, for each user ID identified on Attachment A, information pertaining to the following matters:

- (a) The filing of false income tax returns, mail and wire fraud, and engaging In Unlawful Monetary Transactions by sing using the proceeds of the mail and wire fraud scheme to purchase property of a value greater than $10,000, and

- (b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

- (c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

- (d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

4